UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | Criminal No. 09-63-ART |
| v. | ) | |
| | ) | **MEMORANDUM OPINION &** |
| EMIR DADANOVIC, | ) | **ORDER** |
| KEMAL DUGALIC, | ) | |
| OMER DUGALIC, | ) | |
| DONTA HAMILTON, and | ) | |
| JERDIN OVIDIO YANES, | ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

The government sought a series of wiretaps against the defendants after trying more conventional investigative tools. Each new application included an up-to-date explanation as to why those alternatives had proven inadequate. Despite the defendants' protestations otherwise, the wiretaps therefore met the requirements of 18 U.S.C. § 2518(1)(c). The Court previously denied the defendants' suppression motions, promising this opinion to explain its reasoning.

### BACKGROUND

In February 2008, law enforcement won the cooperation of an individual suspected of distributing cocaine when it found 93.7 grams of the drug in his home. R. 329, Ex. A at 5. The cooperator, "CS1," then snared "CS2" by way of several controlled buys. *Id.* at 6. CS2 fingered defendant Kemal Dugalic as his cocaine source, revealing that Dugalic used his landline and cellular phone to conduct business. *Id.* In turn, Dugalic divulged to CS2 that his source was a

Bosnian organization in Ohio and Bowling Green, Kentucky, that used a trucking company as a front for distributing sizeable shipments of cocaine. *Id.*

The government wanted to map the reaches of the suspected drug network. It sought Dugalic's source of supply and information on the organization's methods of distribution and money laundering. *Id.* at 5. Investigators continued to make use of their cooperating witnesses; conducted physical surveillance of Kemal Dugalic and other suspects; sought an interview with a suspected member of the conspiracy; and compiled pen register and trap and trace information on Dugalic's phone. *Id.* at 25-34. These methods met with limited success. As a result, Special Agent Jerel Hughes applied for and secured the first of six wiretap warrants on April 27, 2009. The defendants argue that these wiretaps were not justified under 18 U.S.C. § 2518(1)(c). They misunderstand the statute.

## DISCUSSION

**I. Compliance with § 2518(1)(c)**

As the issuing authority, Judge Gregory F. Van Tatenhove's determination that these wiretaps were appropriate is entitled to "great deference." *United States v. Rice*, 478 F.3d 704, 709 (6th Cir. 2007).

An investigator seeking a wiretap must provide a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Under this provision, the government need not exhaust all other potential avenues or show the "absolute impossibility of all other means." *United States v. Alfano*, 838 F.2d 158, 163-164 (6th Cir.

1998). Instead, investigators need only show that the wiretap is not their "initial step." *See United States v. Cooper*, 868 F.2d 1505, 1509 (6th Cir. 1989) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)). They must demonstrate that they gave "serious consideration to . . . non-wiretap techniques prior to applying for wiretap authority" and inform the court of the reasons that those techniques have been or likely will be inadequate. *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985).

The investigators did this. In each new application, they detailed their attempts to conduct the investigation without wiretaps and explained why those methods were inadequate with reference to the specific facts of the case. *See Cooper*, 868 F.2d at 1509 ("Thus, the facts submitted . . . establish that the 'normal investigative procedures' had been extensively conducted, and that the requested interception of wire and oral communications was not 'employed as the initial step in criminal investigation." (citing *United States v. Giordano*, 416 U.S. 505, 515 (1974))); *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977) (holding that affidavit must not be "purely conclusory" and must "show[] . . . factual relations to the circumstances at hand").

1. The investigators' April 27, 2009, application for a wiretap on Kemal Dugalic's hardline phone, R. 329, Ex. A, discussed methods tried and reasons for their insufficiency.

- The affidavit detailed the government's use of two cooperating witnesses to collect evidence against Dugalic. *Id.* ¶¶ 15-28. In one instance, a cooperating witness wore a wire while conversing with Kemal Dugalic. *Id.* ¶¶ 18-28. Yet these witnesses were of limited utility. While they could help prosecute Kemal

Dugalic, their reach stopped there. They proved unable to collect information on stash house locations, the frequency of narcotics transports, or the identities of other members of the conspiracy. In part this was because the witnesses were not proficient in the languages in which the conspiracy was conducted. Though they sought help from their two cooperating witnesses in identifying other cooperators, the investigators were not successful. *Id.* ¶ 32.

- The investigators' cooperating witnesses advised it would not be possible to introduce undercover agents into the organization. *Id.* ¶ 31.

- The government obtained toll and pen register records for Dugalic's phone, which helped identify other numbers possibly linked to other individuals in the operation. *Id.* ¶ 29. But these records did not themselves identify the participants in the conversations or identify the nature of the conversations. *Id.* ¶ 40.

- The government conducted physical surveillance. This, too, had limits. Several of the suspects lived in rural areas on one-lane roads, and so monitoring vehicles could be easily detected. *Id.* ¶ 33.

- Witness interviews were risky. In one instance, the government tried to interview a suspect who instead alerted other members of the organization. *Id.* ¶ 38.

- Search warrants, the government said, would be premature because none of the cooperating suspects were aware of locations used as stash houses. *Id.* ¶ 39.

- Searching suspects' trash was problematic. Surveillance suggested that Kemal Dugalic burned his trash. *Id.* ¶ 41. Investigators could not determine whether

4

others used commercial sanitation services. And trash at one location was located at the end of a long private driveway, exposing investigators to detection. *Id.*

2. A May 20, 2009, application for a wiretap on Kemal Dugalic's cell phone, R. 329, Ex. B, provided similar information:

- Listening to calls on his hard line and collecting pen register data on his cell phone, investigators determined that Kemal Dugalic was using his cell to conduct nefarious business while traveling. *Id.* ¶¶ 12-28, 36. Traditional methods of investigation remained limited, so a wiretap on Dugalic's cell phone was needed.

- The opportunity to use undercover agents still had not developed. Furthermore, the already existing wiretap revealed that the organization had operations across multiple states. Thus, an undercover operation alone could not secure enough information to prosecute all members. *Id.* ¶ 38.

- Investigators' belief in their cooperating witnesses' limits was corroborated by information gleaned by the existing wiretap and physical surveillance. Through the wiretaps, the investigators learned of one former stash house location, Dugalic's travel methods, and the identity of some members of the conspiracy—all things unknown to the cooperating witnesses. *Id.* ¶ 39.

- Law enforcement continued physical surveillance, including installation of a pole camera and following Dugalic on a trip from Kentucky to Ohio. Yet investigators did not believe they could learn significantly more this way, and they worried that further surveillance might be detected. *Id.* ¶ 40.

- Search warrants still were not likely to be fruitful, even though two potential stash house locations had been uncovered. First, physical surveillance revealed that one stash house was no longer in use. Second, investigators placed a pole camera at another location. Searching that location would only compromise the investigation with little likelihood of identifying members of the organization other than Kemal Dugalic. *Id.* ¶ 43.

3. On May 29, 2009, the government filed an application to renew the wiretap on Kemal Dugalic's hard line. R. 329, Ex. C. In addition to repeating concerns expressed in previous affidavits, *see, e.g.*, *id.* ¶ 54, investigators explained:

- The existing wiretaps on Kemal Dugalic's hardline and cellular phones had not yet produced enough information to prosecute his suppliers. *Id.* ¶ 50.

- An agent tried to reach out to an individual with whom Kemal Dugalic met on May 15 and 16, 2009. But that individual's interest in the agent, it turned out, was only romantic. *Id.* ¶ 53.

- Physical surveillance continued to bear some fruit. While monitoring Kemal Dugalic on the previously mentioned trip from Kentucky to Ohio, investigators uncovered the identity of at least one associate, the locations he frequented, and the manner in which he attempted to evade law enforcement. They also followed Omer Dugalic, Kemal's brother, as he arrived in Columbus from Chicago. This, too, uncovered the identity of one of his associates, allowed law enforcement to photograph other unidentified associates, and provided insight into Omer

> Dugalic's method of operation. The investigators could not see, however, how further physical surveillance would significantly move the ball forward. *Id.* ¶ 55. And they worried that more invasive surveillance might be detected. *Id.*

- Investigators did not think trash pulls would further the investigation. When observing Omer Dugalic, they learned that he conducted his illegal activities in hotel rooms—rendering trash pulls difficult. *Id.* ¶ 60.

4. The investigators next sought a cell phone wiretap against another suspect, Emir Dadanovic, on July 15, 2009. R 329, Ex. D. On top of concerns expressed in previous affidavits, the investigators explained:

- While listening to calls on the pre-existing wiretaps, they came to believe that Emir Dadanovic was Kemal Dugalic's supplier. Dadanovic used his cell phone to communicate with Dugalic. *Id.* ¶¶ 12-46.

- Use of undercover agents was not likely to help gain information about Dadanovic. As hard as it was to get undercover agents to penetrate the organization at Omer Dugalic's level, it would be even more difficult to do so at Dadanovic's. *Id.* ¶ 52.

- Dadanovic limited his contacts to immediate subordinates, and so it was unlikely that the government could get a cooperating witness close to him. Furthermore, Dugalic never expressed willingness to introduce any buyers to Dadanovic. *Id.* ¶53.

- The prospects for physical surveillance were bleak. Tracking location data on Kemal Dugalic's phone would not permit law enforcement to learn Dadanovic's own source of supply. Agent Hughes, with his experience, did not believe it likely that Dadanovic would meet with his own source of supply at the same time he met Dugalic. Further, although law enforcement executed a traffic stop on Dadanovic, they were unable to gain enough information to prosecute him. *Id.* ¶ 54.

- Interviews of target suspects would prove problematic at that stage. The Dugalics were traveling to Bosnia and would likely not return if they learned that co-conspirators had been arrested. *Id.* ¶ 56.

- The government could not execute a search warrant of Dadanovic's house because they had not located it yet. *Id.* ¶ 58.

- Trash pulls were unlikely to produce evidence. Law enforcement had not yet located Dadanovic's home, eliminating the possibility of a trash pull against him. And because the conspirators were using "stash houses," residences held in names other than their own, evidence taken from trash pulls would likely be unuseable. *Id.* ¶ 60.

5. Omer Dugalic's cell phone was the object of an August 12, 2009, wiretap application. R. 329, Ex. E. As before, investigators added additional concerns about conventional tools on top of those repeated from prior applications.

- The wiretap on Dadanovic's cell phone had not produced actionable information. As a result of the traffic stop, investigators learned that Dadanovic carried multiple phones and changeable SIM cards that enabled him to alter a device's phone number in seconds. Further, investigators knew that members of the suspected organization frequently called pre-paid cell phones registered in obviously fictitious names. Law enforcement grew concerned about the limits of their ability to listen to Dadanovic's calls when they learned from investigators in Pittsburgh that Omer Dugalic directed the delivery of multiple kilograms of cocaine there. Their wiretap on Dadanovic's phone revealed nothing about this delivery. As a result, they sought a wiretap on Omer Dugalic's phone. *Id.* ¶ 47.

- Use of undercover agents was still not a viable option. Dadanovic surrounded himself with an exclusive inner circle of Bosnian immigrants who all had known each other a long time and had been vetted by family ties. *Id.* ¶ 51.

- The experience of a parallel investigation in Pittsburgh underscored the impracticality of reliance on confidential informants. Pittsburgh DEA investigators sought insiders to glean information on Omer Dugalic and Emir Dadanovic, but failed to gather anything substantial. *Id.* ¶ 53.

- The investigators catalogued the history of physical surveillance in this project, noting its limited success. The affidavit mentioned that investigators utilized GPS information drawn from Kemal Dugalic's, Omer Dugalic's, and Emir Dadanovic's cell phones to conduct surveillance. They also placed a tracking

- device on a vehicle linked to the group. These measures gave law enforcement opportunities to observe and identify members of the conspiracy. Yet they could not help ultimately determine Dadanovic's source of supply. Sophisticated drug organizations typically do not place suppliers and buyers in one place at the same time. *Id.* ¶¶ 55-63.

- Executing a pre-arrest search remained a fruitless option. As of the date of this application, investigators had not located Dadanovic's residence and only knew of one stash location. Given the size of the organization, they did not believe this stash location was the only one. Because searching this one location would alert the conspirators to the investigation and potentially foreclose finding other locations, a pre-arrest search was still premature. *Id.* ¶¶ 68-69.

6. Finally, on October 1, 2009, investigators applied for one final wiretap against Emir Dadanovic's cell phone. In addition to concerns previously expressed, the investigators once more outlined the shortcomings of conventional investigative tools.

- The previous wiretaps had not completely unraveled the organization. *Id.* ¶ 39. In particular, Dadanovic's source of supply remained elusive. *Id.* ¶ 40. Previous wiretaps were limited because the participants used pre-paid phones to conduct the majority of their illegal activity, registered under fictitious names and discarded frequently. *Id.* ¶ 40. Additionally, investigators believed the Dadanovic organization had replaced its cell phones with new direct connect phones. *Id.* ¶ 41.

- Physical surveillance continued to meet with limited success. In one July 21, 2009, episode, suspect Halil Batlak discovered the surveillance. Organization members discarded their cell phones, and Batlak fled to Bosnia. *Id.* ¶ 45.

- Batlak's flight to Bosnia further exposed the weakness of attempting to approach suspects for interviews. Law enforcement was concerned that reaching out to other suspects would also lead them to flee abroad. *Id.* ¶ 47.

- While investigators had finally found more than one storage location, a pre-arrest search was still not necessarily a viable option. One location, located in Indianapolis, was in an apartment building. The apartment was accessible through a common entrance, preventing investigators from observing who entered the apartment and identifying which particular apartment was the storage facility. *Id.* ¶ 48.

- Law enforcement did collect trap and trace and/or toll record information on Dadanovic's phone. But, again, these methods could not identify call participants or the substance of conversations. *Id.* ¶ 49.

Despite all of this, the defendants persist. Their burden in challenging these applications is a heavy one. And not just because the wiretap affidavits were so thorough, or even just because Judge Van Tatenhove's decisions to allow the wiretaps are entitled to "great deference." *Rice*, 478 F.3d at 709. According to the Sixth Circuit, use of wiretaps is especially appropriate in circumstances like these, where phone communication is central to the operation under investigation. *United States v. Stewart*, 306 F.3d 295, 305-06 (6th Cir. 2002) ("We have

11

previously recognized that wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation.").

The defendants first argue that wiretaps were not appropriate here because the government failed to exhaust alternative options, R. 297 at 4-6; R. 310 at 3-7; R. 313 at 2-4, and the conventional techniques that investigators tried were successful, *see, e.g.,* R. 297 at 2. But the government need not exhaust alternatives, *Alfano*, 838 F.2d at 163, 164; show that conventional methods are "absolutely impossible," *Id.* at 163; or even show that those methods were unsuccessful. In *Cooper*, the appellants similarly argued that conventional methods produced "satisfactory results." The court held that the wiretap was nonetheless appropriate. The wiretap application, the court explained, revealed that normal procedures had been "extensively conducted" and "the requested interception of wire and oral communications was not 'employed as the initial step in criminal investigation.'" 868 F.2d at 1508-09 (quoting *Giordano*, 416 U.S. at 515). As outlined above, the same is true here.

But, respond the defendants, these affidavits impermissibly relied upon conclusory, boilerplate allegations that conventional techniques were not likely to succeed. *See, e.g.,* R. 297 at 4-7. It is true that the affidavits are conclusory in some places. But this does not matter. The applications also make specific allegations tied to the facts of this case. *Landmesser*, 553 F.2d at 20-21 (holding that, while paragraph outlining reasons why statutory requirements were met was itself conclusory, the affidavit satisfied those requirements because it detailed the investigative steps taken in detail).

The defendants next argue that later-filed affidavits impermissibly relied on the allegations in prior affidavits as to why a wiretap was appropriate. *See, e.g,* R. 310 at 9-10. To support the claim that applications for additional wiretaps cannot rely upon the allegations made in earlier applications, the defendants rely upon the Ninth Circuit's holding in *United States v. Gonzalez*, 412 F.3d 1102, 1115 (9th Cir. 2005). There, the court held that the government could not meet the necessity requirement for a second affidavit by merely "attempt[ing] to shoe-horn the significant investigatory work the government conducted before applying for the" first wiretap. *Id.* The court added that "the government is not free to transfer a statutory showing of necessity from one application to another—even within the same investigation. This court has held that an issuing judge may not examine various wiretap applications together when deciding whether a new application must separately satisfy the necessity requirement." *Id.* But, here, the government did not just "shoe-horn" its prior attempts at conventional investigation into each subsequent application. As outlined above, each application added additional descriptions of investigatory steps taken and why they were inadequate. The applications also reveal that investigators continued to try conventional techniques through the investigation. They did not simply turn to wiretaps as a default.

Behind the defendants' argument is a misguided reliance on *United States v. Rice* as supplying a more stringent standard for scrutinizing the propriety of a wiretap. 478 F.3d 704 (6th Cir. 2007). *See, e.g.*, R. 310 at 3; R. 313 at 2. In *Rice*, the court indeed affirmed the district court's decision to suppress evidence stemming from a wiretap on the grounds that the government did not demonstrate its propriety under the statute. *Id.* at 710. It reached this result

even though the affidavit detailed two conventional investigatory steps taken prior to seeking a wiretap. The court explained that, aside from those two steps, "the district court found that the [affidavit] contained generalized and uncorroborated information about why the grand jury subpoenas, witness interviewing and search warrants, and trash pulls would not be useful." *Id.* at 711. But *Rice* did not hold that the district court's standard represented the minimum requirements for demonstrating the propriety of a wiretap. Rather, it merely held that the district court's decision to suppress was not clearly erroneous. *Id.* at 710-11. What's more, the court held that the decision to permit a wiretap was not entitled to deference in that case because law enforcement's application was misleading.[1] *Id.* at 709.

**II. Probable Cause**

One final issue: In the course of challenging these wiretaps, two defendants also argue that there was no probable cause justifying the wiretap warrants against them. To secure a wiretap warrant, the government must show a "fair probability" that evidence of a crime will be

---

[1] Dadanovic seems to suggest several times that the affidavits in this case misled the Court. For example: "The affiant further specifies at page 5 in paragraph 11 that Dadanovic, referred to as Dida, is the leader of the organization. Again, this may be Agent Hughes's belief, however, he sets forth no factual basis for this belief and therefore this statement, when stated as a fact, is misleading to the court." R. 297 at 3; *see also id.* at 4-6 (claim that defendants transported or sold stolen vehicles or illegal immigrants are "misleading" because no proof is provided in the affidavit), 6 (claim that reference to a sum of money found in a vehicle stopped in Texas is misleading because there is no link to Dadanovic in the affidavit). This is different from the misrepresentation in *Rice*. There, the court found that the investigators misled the court about the investigative steps taken. 478 F.3d at 707. In contrast, none of the purported misrepresentations in this case would influence the determination whether a wiretap is appropriate. That is, none of these misrepresentations would influence the issuing court's determination whether investigators adequately tried conventional investigative techniques before seeking a wiretap.

uncovered—less than "proof beyond a reasonable doubt or even a *prima facie* showing." *Alfano*, 838 F.2d at 161-62. Additionally, the statute requires probable cause to believe (1) that the target individual has or will commit an offense; (2) that particular communications concerning that offense will be obtained through the interception; and (3) that the facilities or place from which the communication is to be intercepted are being used in connection with the commission of the offense. 18 U.S.C. § 2518(3)(a),(b),(d). The Ninth Circuit apparently interprets the third item as requiring probable cause to believe "that the individual who is the focus of the wiretap investigation will use the tapped phone." *United States v. Meling*, 47 F.3d 1546, 1552 (9th Cir. 1995).

Dadanovic claims that the July 15, 2009, affidavit, which sought a wiretap on his pre-pay cell phone, did not satisfy the probable cause requirement. R. 297 at 3-4. He insists that the allegations regarding Dadanovic's role in the operations are all conclusory. *Id.* He is wrong as to all three statutory probable cause requirements.

First, the affidavit contains specific evidence that he has or will commit an offense. Previously intercepted calls identified someone named "Dida" as the leader of the organization and someone to whom Kemal Dugalic, Omer Dugalic, and others were subordinate. Law enforcement learned that "Dida" was Emir Dadanovic when they executed a traffic stop against Dadanovic and then listened to the wiretap as suspects spoke about the stop in connection with Dida. R. 329, Ex. D ¶¶ 11, 14-15. Also in the affidavit are conversations in which Dadanovic appears to be cryptically talking about the quality of drug shipments. For example: "It is good.

15

The other one wasn't that good, you can ask Omco. . . . [T]he other one wasn't that good, know what I mean? The good one arrived, know what I mean?" *Id.* ¶ 20.

Regarding the second and third requirements, the affidavit indicates both that Dadanovic was using the target phone in connection with the offense and that a wiretap on the target phone would capture communication concerning the offense. Toll and pen records for this particular phone reflect a number of calls from other participants in the scheme. *Id.* ¶ 47. And the affidavit includes a transcript of calls between Kemal Dugalic and Dadanovic which Dadanovic initiated through the target phone. *Id.* ¶¶ 41, 43. In one particular conversation, Dadanovic and Kemal Dugalic seem to be cryptically discussing drug debts. *Id.* ¶ 43.

It is unclear whether Dadanovic also contests probable cause for the October 1, 2009, application for a second wiretap against him. If so, his argument fails for the same reasons. That affidavit provided probable cause to believe Dadanovic had or would commit an offense. For example, it includes a transcript of a conversation between Dadanovic and Kemal Dugalic that appears to be about collecting drug money and selling the remaining drug supply. R. 329, Ex. F ¶¶ 9-10. And the application offers probable cause to believe the target phone was being used by Dadanovic in connection with the offense and that a wiretap would capture inculpatory communications. For instance, investigators noted that several of the numbers called from the target phone were the same as those called on one of Dadanovic's previous phones. *Id.* ¶ 32. Many of the numbers called from the target phone were for prepay cellular phones, consistent with the call pattern on Dadanovic's prior phones. *Id.* ¶ 35. And the series of call transcripts

reproduced in the affidavit indicate that Dadanovic conducted operations telephonically, *id.* ¶¶ 12-28—making it likely a wiretap would capture relevant conversations on this phone.

Omer Dugalic also argues that the August 12, 2009, warrant application to tap his phone was not supported by probable cause. R. 313 at 4-5. He argues that, under the Ninth Circuit's holding in *United States v. Meling*, a wiretap application must demonstrate probable cause to believe "that the individual that is the focus of the investigation will use the tapped phone." *Id.* at 5 (citing *United States v. Meling*, 407 F.3d 1546 (9th Cir. 1995)). In light of *Meling*, Dugalic argues that, while he was the "primary user" of the phone, "the primary *target* [was] Emir Dadanovic." *Id.* (emphasis added).

But Dugalic's reading of the Ninth Circuit's rule—requiring probable cause to believe the "primary target" of the investigation will use the tapped phone—cannot be squared with the text of the statute. The *Meling* court's holding that there must be probable cause to believe that "the individual who is the focus of the wiretap investigation will use the tapped phone" specifically cited to § 2518(3)(d). 47 F.3d at 1552. In turn, that section requires that "there [be] probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are being used in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person." 18 U.S.C. § 2518(3)(d). A look at the statute as a whole reveals who "such person" is:

> **(3)** Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire, oral, or electronic communications . . . if the judge determines on the basis of the facts submitted by the applicant that-

17

**(a)** there is probable cause for belief that **an individual is committing, has committed, or is about to commit a particular offense** enumerated in section 2516 of this chapter;

**(b)** there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

**(c)** normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

**(d)** except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, **in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.** *Id.* § 2518(3) (emphasis added).

"Such person" is the "individual" in subpart (a) who "has committed, or is about to commit a particular offense." *Id.* at § 2518(3)(a). As a result, the statute is satisfied either if 1) the phone is being used by someone in connection with the offense or 2) it is commonly used by an individual who "is committing, has committed, or is about to commit a particular offense." Here, the affidavit contains transcripts of calls from Omer Dugalic's phone that reflect his participation in the criminal enterprise. *See, e.g.*, R. 329, Aug. 12, 2009 Aff. at 15-16 (Omer Dugalic and Kemal Dugalic apparently discuss "a quantity of cocaine that has been cut and broken down"). The investigators had probable cause.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that the defendants' motions, R. 297, R. 310, and R. 313, are **DENIED**.

This the 10th day of September, 2010.

Signed By:
*Amul R. Thapar* AT
United States District Judge